UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

---------------------------------------------------X

HALCYON HEMPWORKS LLC,

Plaintiff,

-against-

THE QUANTUM GROUP LLC,
GHS INDUSTRIES, INC.,

Defendants.

---------------------------------------------------X

**No.:**

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff, HALCYON HEMPWORKS LLC, by and through counsel, respectfully submits this Complaint and alleges as follows:

**INTRODUCTION**

1. This case highlights one of the great perils of startup endeavors – running afoul of vendor businesses, such as the Defendants herein, who will take advantage of inexperienced would-be founders to charge exorbitant fees for minimal or no return.

2. Plaintiff's founders, a pair of young military veterans, went into business school intending to create Plaintiff and enter the hemp product processing space. In their quest for guidance with giving their fledgling business its best chance at success, including finding investors to make the business possible by providing capital, they were unfortunately introduced to Defendants.

3. Defendants took advantage of Plaintiff's inexperience, charging tens of thousands of dollars to provide two boilerplate documents that Plaintiff was not able to use and wasting months of time, Plaintiff's effort, and the entirety of Plaintiff's available resources in an ill-fated

quest to pursue the promise of a capital raise effort in a an already oversaturated and underfunded market space. In short, Defendants made – and billed for – promises that they knew they could not fulfill and drained Plaintiff of all of its funds, rendering the startup business an impossibility.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331. This Court has supplemental jurisdiction over the state causes of action plead herein.

5. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b)(3).

**THE PARTIES**

6. Plaintiff Halcyon Hempworks LLC ("Halcyon") is a limited liability company registered in the State of Virginia.

7. Defendant The Quantum Group LLC ("Quantum") is a limited liability company registered and headquartered in the State of Ohio.

8. Defendant GHS Industries Inc. ("GHS") is a corporate entity registered and headquartered in the State of Kentucky.

**FACTS COMMON TO ALL CAUSES OF ACTION**

9. Plaintiff Halcyon originated in late 2021 with founders James Holland ("Holland") and Daniel Lee ("Lee").

10. Holland and Lee, two young entrepreneurs and military veterans, formed Halcyon with the intention of building a hemp processing, "zero waste" business that would offer a diverse array of hemp fiber products.

11. Halcyon planned to offer a variety of environmentally beneficial products that would be manufactured using each part of the hemp plant.

12. Halcyon was a startup business needing equipment, guidance, and in particular assistance with raising capital to ensure adequate funding.

13. Halcyon's founders intended to capitalize upon the legalization of hemp farming in 2018, believing that there were few businesses offering the products and service that Halcyon planned to provide.

14. Lacking business experience, particularly in the arena of startups, Holland and Lee began to research resources and to seek out sources of help.

15. In September and October of 2021, Holland's research led him to speak with various different entrepreneurs in the field of hemp products in particular and business formation in general.

16. On or about October 13, 2021, Holland spoke with Patriot Business Finance ("Patriot")'s representative, Paul Whitehouse ("Whitehouse"). Whitehouse encouraged Holland to deal exclusively with Defendants Quantum and GHS, claiming that both were experts in the growing field of hemp products as well as the capital raises required of new startup businesses.

17. On or about October 18, 2021, Holland spoke with another member of Patriot who similarly encouraged him to work with Quantum and GHS. Holland was told that in order to work with Quantum and gain their assistance and expertise with raising capital, he would have to show that Halcyon was a serious and legitimate startup business by making an upfront investment, specifically in GHS, as a "deposit" on equipment.

18. On or about October 28, 2021, Holland spoke directly with GHS Founder and CEO Jeremy Luciano ("Luciano"), who confirmed that a $50,000 "deposit" with GHS would secure equipment for Halcyon's eventual purchase and use, and that this type of deposit was a necessity

for Halcyon to be eligible to work with a capital fundraising service and be able to enter the marketplace effectively.

19. Over the next couple of months, Holland continued to research the best way to start Halcyon, speaking with various different companies active in the hemp market and representatives of different state economic development initiatives, with an eye towards engaging the services of GHS and Quantum.

20. During this same time period, Holland and Lee were gathering funds to pay for the services of GHS and Quantum.

21. By January of 2022, Holland and Lee believed that their initial legwork was done and that they were ready to make concrete moves to develop and promote Halcyon.

22. On or about January 17, 2022, Holland spoke with Whitehouse again, telling him that they had access to the initial capital and asking him what their immediate next steps should be.

23. Whitehouse asked to meet with Lee, and instructed Holland to set up meetings with Luciano to sign with GHS; Whitehouse committed to introduce Holland and Lee to Quantum once GHS was retained.

24. On February 7, 2022, Halcyon paid a non-refundable $50,000.00 "retainer" to GHS in order to obtain their services.

25. In the retainer agreement, signed by Holland on Halcyon's behalf and by Luciano on behalf of GHS and annexed hereto as Exhibit "A," GHS committed to:

a. Open GHS's network of partners to Halcyon as needed ("including but not limited to financial partners, CFO, investors, structural engineers…");

b. Conduct a meeting with GHS's Manufacturing Partner Cretes and Halcyon to discuss equipment and design of facility specific to Halcyon (Halcyon was allowed to visit Cretes in Europe if travel permitted);
c. Provide Halcyon with a formal quote for the total cost of equipment for their chosen hemp fiber processing facility package;
d. Provide guidance to Halcyon in sourcing local services not provided by the manufacturer to complete procurement and installation;
e. Cross promotions with Halcyon to help Halcyon gain traction;
f. Provide Halcyon with a facility layout rendering based on their specific design (after payment of an additional engineering fee).

26. Cretes did provide a formal quote for the cost of hemp fiber processing equipment to Halcyon on or about February 16, 2022.

27. With the exception of the formal quote from Cretes, Halcyon did not receive any other services or assistance from GHS.

28. Halcyon had retained GHS as a required step to forming an agreement with Quantum. Halcyon believed that Quantum's services were required to assist and guide the new business through the capital funding process.

29. Quantum's President and CFO, Stafford Worley ("Worley"), and his partner or colleague William Hartung ("Hartung") spoke with Holland and Lee and provided them with a Professional Services Agreement dated February 14, 2022.

30. The Professional Services Agreement ("PSA"), annexed hereto as Exhibit "B," purported to describe three phases of service that Quantum would provide to Halcyon, each

involving a set pre-paid fee and each being aimed towards a promised capital raise on Halcyon's behalf of $30,000,000.00.

31. Unbeknownst to Halcyon, while some Quantum personnel held licenses to be involved in securities transactions, Worley and Hartung on information and belief did not. At all relevant times, Worley and Hartung were the only Quantum personnel that Holland and Lee dealt with, other than support staff.

32. In addition to being unregistered with FINRA, Worley and Hartung lacked registration with their local Ohio securities regulators.

33. Hartung and Worley assured Holland and Lee that they were professionals with a range of funding sources in their network and that they had experience specifically in fundraising for startup hemp processing companies.

34. Hartung and Worley repeatedly stated that they believed they would be able to achieve Halcyon's capital raise goals by following their "system."

35. Quantum, through Hartung and Worley, claimed that they would be screening investors along the way, and that they were part of a syndicate that had a large pool of investors which would assist in the capital raise process on a reasonable timeline.

36. Hemp production in the United States had peaked in 2019, fueled in part by the spike in popularity of growing for CBD and the mistaken connection between the two related plants. By 2021, hemp farming was already vastly reduced, and the market was continuing to contract. Will Hemp Production Decrease Again in 2021? - Hemp Benchmarks; The Hemp Boom is Over. What Now? - Stateline

37. The rapid reduction of farmers willing to grow hemp was well-covered by the media and would have been either known or easily discovered by any legitimate fundraising entity prior to the acceptance of the PSA by Halcyon.

38. Quantum ignored or unjustifiably failed to investigate the actual likelihood of successfully raising capital for a hemp processing startup, and encouraged Halcyon to engage their services pursuant to the PSA.

39. Hartung and Worley assured Holland and Lee that Halcyon would remain in control throughout the capital raise process.

40. On February 24, 2022, Holland executed the PSA on Halcyon's behalf and delivered it via e-mail to Worley and Hartung.

41. On February 28, 2022, Halcyon wired $35,000.00 to Quantum pursuant to Addendum A of the PSA, which required up-front payment for the preparation by Quantum of a Preliminary Prospectus.

42. In April of 2022, Quantum's focus in meetings with Halcyon was on soliciting investors in private investment bonds and/or public bonds, while avoiding equity firms.

43. During this same time period, Quantum began discussing the use of a test crop to work out any issues with the equipment or logistics; the test crop would be funded through the capital raise, according to Quantum.

44. By the beginning of May 2022, Quantum had raised the recommended capital raise amount from $30,000,000.00 to closer to $42,000,000.00. Quantum representatives stated that they would have the Preliminary Prospectus done by later in the month and that they would then begin reaching out to financial sectors.

45. Quantum continued to represent that they were intending to seek the entirety of the financing through a mix of bonds.

46. Contrary to the initial promise that Halcyon would remain in control throughout the process, Quantum dictated both the pace of the interactions and the content of meetings, making it clear that Holland and Lee were expected to follow instructions.

47. On May 31, 2022, Quantum provided Halcyon with a Preliminary Prospectus.

48. The Preliminary Prospectus consisted of an Executive Summary using language provided by Halcyon and also describing GHS and Quantum; a Company Overview repeating and in some instances rephrasing much of the Executive Summary; a Products Offered list supplied by Halcyon; a Marketing/Sales Strategy section promising that a marketing strategy would be developed in coordination with another consultant and containing primarily generic information about the global hemp market and possible uses for hemp; a Management Profile which again recycled and rephrased information from the Executive Summary; and the Desired Deal Structure and Use of Proceeds. Finally, the Preliminary Prospectus contained a Financial Information section based on what Quantum claimed to be significant due diligence and containing tables with a sufficiently rosy forecast to theoretically attract potential investors.

49. The Preliminary Prospectus also had two appendices; one dedicated full-page descriptions to each associated Quantum staff member, while condensing Halcyon's founders and future advisory board into a single abbreviated page, and the second consisted of the equipment proposal provided to Halcyon by Cretes through GHS.

50. Addendum A to the PSA, Exhibit B herein, specifically represented that the Preliminary Prospectus was "intended to be used by Halcyon in support of an effort to raise capital related to Halcyon's hemp processing business startup." The language of the Prospectus itself,

however, represented that it was the sole property of Quantum, severely limiting its usefulness to Halcyon despite the substantial fee paid by Halcyon for its preparation. Hartung and Worley later confirmed that Halcyon was not allowed to use or distribute the Preliminary Prospectus as it remained, in their view, the property of Quantum.

51. Following the preparation of the Preliminary Prospectus, Halcyon paid another non-refundable, due in advance fee to Quantum of $25,000.00, this time for the preparation of a Private Placement Memorandum ("PPM"), in accordance with Addendum B to the PSA.

52. Similar to the Preliminary Prospectus, Addendum B stated that the PPM was "intended to be used in support of an effort by Halcyon to raise capital related to Halcyon's hemp processing business startup."

53. On or about June 27, 2022, Quantum produced a PPM.

54. The PPM purported to offer private bonds in Halcyon for a minimum $100,000.00 investment.

55. With the exception of a single page describing Holland and Lee's backgrounds, and references throughout to the offered bond principal amount, including the minimum and maximum offering amounts, the bare-bones PPM consisted of boilerplate warnings and subsections required for the sale of private investment bonds, and utilized the Preliminary Prospectus as an exhibit.

56. Concurrently with the issuance of the PPM, which was solely focused on a private bond offering, Quantum began to raise different proposed mixes of financing in meetings with Halcyon. Quantum now represented that they would seek approximately 75% of the capital raise from the private bond offering, with the remainder to be funded by a combination of equity, mezzanine funding, and subordinate debt.

57. Quantum also stated for the first time in their July 1, 2022 meeting with Halcyon that Halcyon had a number of pre-requisites that would need to be "brought down to ground level" before Quantum's financial partners could be brought in for the capital raise process.

58. The PSA with Quantum required yet another substantial fee from Halcyon; an additional $40,000.00 non-refundable retainer fee, due upon completion of the PPM, and intended to exclusively engage Quantum to consult on coordinating the capital raise for Halcyon.

59. Addendum C to the PSA, which governed this third non-refundable payment to Quantum, stated that Quantum and Halcyon agreed that the capital raise funds would be available for Halcyon's use within an estimated nine months from Halcyon's payment.

60. The PSA provided for a further payment to Quantum of 7% of the capital raise, had any capital raise actually taken place, in addition to the $40,000.00 fee.

61. Halcyon paid the additional $40,000.00 to Quantum on or about July 8, 2022.

62. By the middle of July 2022, five months after signing the PSA, Halcyon was pushing Quantum for less ambiguity, so that they could prepare for each stage as it came and ensure that Quantum had any needed prerequisites in place.

63. For the first time, Quantum mentioned interim borrowing solutions that could be borrowed against the larger capital raise. Quantum represented that another $150,000.00 would be necessary to get Halcyon properly prepared; Halcyon made clear that self-funding this amount, after the amounts they had already poured into GHS and Quantum's fees, would not be possible. Quantum instructed Halcyon to prepare a pre-operational timeline showing how the funds would be spent once they were obtained from whatever source Halcyon could locate.

64. Quantum shifted the capital raise plan to a mix of 60% bond funding, 25% subordinate debt, and 15% equity during this same meeting.

65. By their August 12, 2022, meeting with Quantum, Halcyon had already vetted and lined up several farmers in Virginia willing to raise the initial pilot crop – no small feat in light of the overall glutted market for hemp and requiring substantial time investments by Holland and Lee. Quantum had no suggestions for how to fund the interim budget of $150,000.00 that included this pilot crop.

66. Frustrated by the lack of guidance and support from Quantum, Holland and Lee began researching SBA loans and alternate avenues to raise the interim $150,000.00 without success.

67. When they informed Quantum of these unsuccessful efforts, Quantum's response was to state that they wouldn't need funds until later, and to instruct Halcyon to create yet another budget factoring in any costs that they could think of for the initial 6-9 months of operations and then to add 50% on top of that.

68. Quantum did not explain how this new budget would affect the budgets and financial forecasts included in the bond-centric PPM which, to Halcyon's knowledge, had yet to be shown to anyone other than Halcyon.

69. Like the Preliminary Prospectus, the PPM was presented as being Quantum's property despite the language in the PSA describing its purpose.

70. By September 9, 2022, Quantum was suggesting that salary funding should also be factored into the budget and claimed that they were floating a "small" interim raise of $1,000,000.00 with their financial network. Quantum continued to state that there was plenty of time and that they had ample investment possibilities available.

71. During the same September 9th meeting, Holland and Lee raised the idea of switching processing machinery companies from Cretes to another manufacturer to reduce

equipment costs. At this point, Holland and Lee had heard nothing from GHS since paying their fee.

72. On October 21, 2022, Quantum and Halcyon met again. At this point, Quantum was recommending a capital raise mixture of 60% senior debt, 20% mezzanine, and 20% equity.

73. Quantum for the first time stated that an equity capital raise would be required because it was too early in the process for debt financing to be successful. They projected a three-month time frame before they would have a sense of the availability of equity financing, which would be approximately six months after the payment by Halcyon of the $40,000.00 capital raise retainer.

74. Quantum then raised the interim raise target to nearly $1,500,000.00, adding in interim costs for market studies, a sales consultant, and an independent engineer.

75. By November 4, 2022, Quantum had still raised no funds through either debt or equity channels, nor were any efforts to raise funds ever identified to Halcyon; the lack of interim funding meant that Halcyon could not proceed with the farmers or the initial test crop, nor could they finalize a lease on any of the sites they had researched in Virginia for their physical plant.

76. Quantum suggested funding through either an equity partner or USDA loans, representing that both would take two to three months to get into place but claiming that they were still comfortable with their original nine-month timeline and that there was no need to break Quantum's exclusivity.

77. Halcyon, increasingly nervous about the large expenditure of time and funds with no capital raise in sight, suggested bringing in other capital raise partners to assist, specifically referencing InvestJustly as a potential source of help in finding funding.

78. Quantum and Halcyon again discussed partnering with InvestJustly at the beginning of December 2022.

79. Quantum and Halcyon met again on December 16, 2022. During that meeting, Quantum continued to claim that they were certain that they could raise sufficient capital, but for the first time expressed concern that they could get funding in time for a 2023 crop trial to take place.

80. Quantum announced that at this point their goal was to locate an equity investor who could supply the entire equity portion of the raise, then advance pre-operational interim funds from that amount; a goal that they believed would “somewhat possibly” raise $3,000,000.00 by the end of March, 2023, nine months after Halcyon’s payment of the retainer and significantly less than the full capital raise amount that was originally scheduled to be completed during that period.

81. Quantum also revealed for the first time that they were working on another capital raise for a different client that “might” be leading to some overlap in terms of potential investors.

82. Quantum discussed preparing a two page “teaser” to float to potential investors.

83. Halcyon, rather than Quantum, prepared a “pitch deck” to describe the company to potential investors. Quantum instructed Holland and Lee not to distribute the pitch deck and not to use the Preliminary Prospectus.

84. By the end of December, Holland and Lee realized that Quantum’s constantly changing numbers and deadlines were no longer tied to or consistent with the known costs of Halcyon’s plans and began looking for ways to assist with raising funds, continuing to rely on Quantum’s initial promise that Halcyon would retain overall control.

85. Quantum had consistently pushed back the timeframe for the capital raise, despite having been retained for the sole purpose of raising capital.

86. Quantum was now claiming that they would need to redo the Preliminary Prospectus, while Halcyon was pushing for more control over the process to keep the budgets on track with what was actually needed for their business to move forward.

87. By December of 2022, Quantum had not brought any potential investors or any defined potential sources of funding to Halcyon despite having been paid $100,000.00.

88. By early January of 2023, Halcyon was still trying to get information on the path forward with Quantum while Quantum began insisting that Halcyon sign an additional non-disclosure agreement to protect Quantum's "trade secrets and proprietary information."

89. Halcyon initially requested a significantly reduced interim raise figure, as well as the updated prospectus and an updated sources and uses statement.

90. Negotiations between the parties broke down in mid-January, 2023.

91. Quantum formally terminated the PSA as of July 1, 2023, after refusing to negotiate a revised set of terms.

92. Quantum never raised any funds on Halcyon's behalf.

93. Quantum provided Halcyon with two documents, both consisting largely of boilerplate language with the specifics provided by Halcyon, but did not allow Halcyon to retain the use or ownership of either the Preliminary Prospectus or the PPM.

94. Halcyon paid in full and in advance for both the Preliminary Prospectus and the PPM.

95. Halcyon paid a $40,000.00 retainer for the capital raise that never took place as a direct result of Quantum's dilatory conduct.

96. As a proximate result of Quantum's dilatory conduct and breach of good faith and fair dealing, Halcyon suffered significant monetary loss and damages, including the loss of

$100,000.00 paid to Quantum and the loss of the possibility of entry into the hemp processing marketplace.

97. Halcyon paid $50,000.00 to GHS in return for an array of promised services.

98. With the exception of a quote for hemp processing equipment provided by GHS's affiliate Cretes, GHS failed to provide any of the promised services to Halcyon.

99. As a proximate result of GHS's dilatory conduct and breach of good faith and fair dealing, Halcyon suffered significant monetary loss and damages, including but not limited to the loss of $50,000.00.

100. In addition to the substantial sums paid by Halcyon directly to Quantum and GHS, the breaches by Quantum and GHS drained Halcyon of funds and caused the complete failure of Halcyon.

101. As a proximate result of the breaches of GHS and Quantum, Halcyon suffered additional losses.

102. Holland and Lee paid $14,567.00 in legal fees following Quantum's instructions in an effort to start Halcyon correctly.

103. Lee relocated at an additional cost of $5,000.00 so that he would be physically available for Halcyon's start, with Quantum's knowledge and encouragement.

104. Halcyon through Lee and Holland had additional costs in the form of additional loans and business tuition incurred in the course of visiting and vetting locations, meeting and researching additional vendors, investors, and forms of assistance, and preparing themselves for the start of a business that was irreparably harmed by the actions and inactions of Quantum and GHS. These additional damages to Halcyon amounted to no less than $140,000.00.

105. As a direct and proximate result of Quantum and GHS's breaches, Halcyon was harmed in an amount to be proven at trial, but in no event less than $309,567.00.

**FIRST COUNT**
**(Securities Fraud in Violation of § 10[b])**

**(Quantum CFO LLC)**

106. All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though fully set forth herein.

107. Throughout its relationship with Halcyon, Quantum misrepresented material information in connection with the capital raise.

108. Plaintiff Halcyon detrimentally relied upon Quantum's false representations.

109. Plaintiff Halcyon was harmed by its reliance upon Quantum's false representations.

110. Plaintiff suffered direct and indirect financial harm as a result of its reliance and was destroyed as a result.

111. As a result of Quantum's actions, Plaintiff has suffered injuries and damages including, but not limited to, the loss of One Hundred Thousand Dollars paid to Defendant Quantum.

**SECOND COUNT**
**(Breach of Fiduciary Duty)**

**(All Defendants)**

112. All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though fully set forth herein.

113. Halcyon put its faith special and confidence in GHS and Quantum, both of whom were in a position of superior knowledge and offered guidance in exchange for fees.

114. Halcyon placed its property and its existence in the charge of GHS and Quantum.

115. GHS and Quantum owed a fiduciary duty to Halcyon.

116. GHS breached its duty to Halcyon.

117. Quantum breached its duty to Halcyon.

118. As a result of the Defendants' breach of the fiduciary duty owed to Plaintiff, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Three Hundred and Nine Thousand, Five Hundred Sixty-Seven Dollars.

**<u>THIRD COUNT</u>**
**(Breach of Duty of Good Faith and Fair Dealing)**
**(All Defendants)**

119. All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though fully set forth herein.

120. Halcyon entered into contractual relationships with GHS and Quantum.

121. GHS agreed to provide "guidance" to Halcyon and to open its network of financial partners to them, both describing discretionary forms of performance.

122. GHS acted arbitrarily or unfairly in breach of its duty of good faith and fair dealing by never contacting or working with or for Halcyon again after receiving its fee and providing an equipment quote.

123. Quantum agreed to serve as a consultant to Halcyon throughout the capital raise process, which allowed for discretionary performance.

124. Quantum acted arbitrarily or unfairly in breach of its duty of good faith and fair dealing by the actions and inactions described herein.

125. As a result of the Defendants' breach of the fiduciary duty owed to Plaintiff, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to

be determined at trial but estimated to be no less than Three Hundred and Nine Thousand, Five Hundred Sixty-Seven Dollars.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury as to all issues.

**WHEREFORE,** Plaintiff prays that this Court grant him judgment containing the following relief:

a. An award of damages in an amount to be determined upon the trial of this matter sufficient to compensate Plaintiff for its monetary loss and damages;

b. Such other and further relief as this Court may deem just and proper.

Dated: January 9, 2024

Respectfully submitted,


Eric D. Postow, Esq.
Holon Law Partners, LLP
9480 Main Street #1238
Fairfax, VA 22031
(703)214-2003
epostow@holonlaw.com

Maryam N. Hadden, Esq.
Parlatore Law Group, LLP
*Pro Hac Vice Pending*
260 Madison Avenue, 17th Fl.
New York, New York 10016
646-846-6382
Maryam.hadden@parlatorelawgroup.com