**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **HALCYON HEMPWORKS LLC**,<br>9500 Fairfax Blvd., Apt. 2626<br>Fairfax, Virginia 22031<br><br>Plaintiff,<br><br>v.<br><br>**THEQUANTUMGROUP, LLC**,<br>100 North Main St., Suite 309<br>Chagrin Falls, Ohio 44022<br><br>**GHS INDUSTRIES, INC.**,<br>4044 Fort Campbell Blvd.<br>Hopkinsville, KY 42240<br><br>**STAFFORD WORLEY**, individually,<br>296 North St.,<br>Chagrin Falls, Ohio 44241<br><br>and<br><br>**WILLIAM HARTUNG**, individually,<br>8720 Ferguson Rd.<br>Streetsboro, Ohio 44241<br><br>Defendants. | Civil Action No.: 1:22-cv-00038<br><br>**TRIAL BY JURY DEMANDED** |

**FIRST AMENDED COMPLAINT**

COMES NOW, Plaintiff, HALCYON HEMPWORKS LLC ("Halcyon," or "Plaintiff"), by and through its undersigned counsel, and moves this Honorable Court for judgment against Defendants, THEQUANTUMGROUP, LLC ("Quantum"), GHS INDUSTRIES, INC. ("GHS"), STAFFORD WORLEY ("Worley"), and WILLIAM HARTUNG ("Hartung"; Quantum, GHS,

Worley, and Hartung, collectively, "Defendants"), on the grounds and praying for the relief hereinafter set forth:

## OVERVIEW

1. This case highlights one of the great perils of startup endeavors – running afoul of vendor businesses, such as the Defendants herein, who will take advantage of inexperienced, would-be founders to charge exorbitant fees for minimal or no return.

2. Plaintiff's founders, a pair of young military veterans, went into business school intending to create Plaintiff and enter the hemp product processing space. In their quest for guidance in giving their fledgling business its best chance at success, including finding investors to make the business possible by providing capital, they were unfortunately introduced to Defendants.

3. Defendants took advantage of Plaintiff's inexperience, charging tens of thousands of dollars to provide two boilerplate documents that Plaintiff was not able to use and wasting months of time, Plaintiff's effort, and the entirety of Plaintiff's available resources in an ill-fated quest to pursue the promise of a capital raise effort in an already oversaturated and underfunded market space. In short, Defendants made – and billed for – promises that they knew they could not fulfill and drained Plaintiff of all of its funds, rendering the startup business an impossibility.

4. Defendants induced Plaintiff to enter into an invalid and illegal contract to act as a broker to raise funds in exchange for the sale of Plaintiff's securities without any intention or ability to actually raise funds. Defendants made multiple misrepresentations of fact as well as various omissions of fact in order to obtain funds from Plaintiff. Plaintiff relied on these misrepresentations in providing Defendants with certain monies.

5. Moreover, had Plaintiff become aware of the omissions of facts, Plaintiff would have never entered into any relationship with Defendants or paid any of them any sums of money.

6. Plaintiff brings a claim against Defendants for securities fraud, in violation of § 10[b], breach of fiduciary duty, breach of duty of good faith and fair dealing, breach of contract, quantum meruit, unjust enrichment, and fraudulent inducement of contract, as applicable.

## PARTIES

7. This action arises under the laws of the Commonwealth of Virginia.

8. Plaintiff, at all times relevant hereto, is and has been a limited liability company organized in and under the laws of the Commonwealth of Virginia, Entity ID 11340780, and having a principal place of business at 9500 Fairfax Blvd., Apt. 2626, Fairfax, Virginia 22031.

9. Quantum, at all times relevant hereto, is and has been a limited liability company organized in and under the laws of the State of Ohio, Entity ID 4642846, and having a principal place of business at 100 North Main Street, Suite 309, Chagrin Falls, Ohio 44022.

10. GHS, at all times relevant hereto, is and has been corporation organized in and under the laws of the Commonwealth of Kentucky, Organization No. 1129223, and having a principal place of business at 4044 Fort Campbell Blvd., Hopkinsville, Kentucky 42240.

11. Worley, at all times relevant hereto, is and has been a natural person and citizen of the State of Ohio, residing at 296 North St., Chagrin Falls, Ohio 44241. Upon information and belief, Worley is a member of Quantum.

12. Stafford, at all times relevant hereto, is and has been a natural person and citizen of the State of Ohio, residing at 8720 Ferguson Rd. Streetsboro, Ohio 44241. Upon information and belief, Stafford is a member of Quantum.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as a federal question exists.

14. This Court alternatively has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as complete diversity exists. Plaintiff, a Virginia limited liability company, is a citizen of Virginia. Quantum, an Ohio limited liability company, is a citizen of Ohio. Quantum's members, Worley and Stafford, reside in Ohio. GHS, a Kentucky corporation, is a citizen of Ohio. The matter in controversy exceeds $75,000.00, exclusive of interest and costs.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as Plaintiff's claims are so related to the claims within the Court's original jurisdiction that it forms the part of the same case or controversy.

16. This Court has *in personam* jurisdiction over Defendants in this action pursuant to Fed. R. Civ. P. 4(k)(1)(A) and under Va. Code § 8.01-328.1(A)(1), (3), and (4). Notwithstanding the foregoing, Quantum waived any objection to personal jurisdiction through its prior pleadings in this matter.

17. Venue is proper in the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1391(b)(2) and/or (3), and L. Civ. R. 3(B)(1) and (C), because a substantial part of the events or omissions giving rise to the claims set forth in this First Amended Complaint occurred in this judicial District.

## STATEMENT OF FACTS

### The Creation of Halcyon and its Mission

18. Halcyon was organized on or about February 4, 2022, by founders James Holland ("Holland") and Daniel Lee ("Lee").

19. Holland and Lee, two young entrepreneurs and military veterans, formed Halcyon with the intention of building a hemp processing, "zero waste" business that would offer a diverse array of hemp fiber products.

20. Halcyon planned to offer a variety of environmentally beneficial products that would be manufactured using each part of the hemp plant.

21. Halcyon was a startup business needing equipment, guidance, and in particular assistance with raising capital to ensure adequate funding.

22. Halcyon's founders intended to capitalize upon the legalization of hemp farming in 2018, believing that there were few businesses offering the products and services that Halcyon planned to provide.

23. Lacking business experience, particularly in the arena of startups, Holland and Lee began to research resources and to seek out sources of help.

24. In September and October of 2021, Holland's research led him to speak with various different entrepreneurs in the field of hemp products in particular and business formation in general.

Halcyon's Introduction to GHS and Quantum

25. On or about October 13, 2021, Holland spoke with Patriot Business Finance ("Patriot") representative, Paul Whitehouse ("Whitehouse"). Whitehouse encouraged Holland to deal exclusively with Defendants Quantum and GHS, claiming that both were experts in the growing field of hemp products as well as the capital raises required of new startup businesses.

26. On or about October 18, 2021, Holland spoke with another member of Patriot who similarly encouraged him to work with Quantum and GHS. Holland was told that in order to

work with Quantum and gain their assistance and expertise with raising capital, he would have to show that Halcyon was a serious and legitimate startup business by making an upfront investment, specifically in GHS, as a "deposit" on equipment.

27. On or about October 28, 2021, Holland spoke directly with GHS Founder and CEO Jeremy Luciano ("Luciano"), who confirmed that a Fifty Thousand Dollar ($50,000 USD) "deposit" with GHS would secure equipment for Halcyon's eventual purchase and use, and that this type of deposit was a necessity for Halcyon to be eligible to work with a capital fundraising service and be able to enter the marketplace effectively.

28. Over the next couple of months, Holland continued to research the best way to start Halcyon, speaking with various different companies active in the hemp market and representatives of different state economic development initiatives, with an eye towards engaging the services of GHS and Quantum.

29. During this same time period, Holland and Lee were gathering funds to pay for the services of GHS and Quantum.

30. By January of 2022, Holland and Lee believed that their initial legwork was done and that they were ready to make concrete moves to organize, develop and promote Halcyon.

## The Retainer Agreement with GHS

31. On or about January 17, 2022, Holland spoke with Whitehouse again, telling him that they had access to the initial capital and asking him what their immediate next steps should be.

32. Whitehouse asked to meet with Lee, and instructed Holland to set up meetings with Luciano to sign with GHS; Whitehouse committed to introduce Holland and Lee to Quantum, but only once GHS was retained.

33. On February 7, 2022, Halcyon paid a non-refundable Fifty Thousand Dollar ($50,000.00 USD) "retainer" to GHS in order to obtain their services memorialized in a written Retainer Agreement ("Retainer Agreement"), attached hereto and incorporated herein by reference as **Exhibit A**.

34. In the Retainer Agreement, signed by Holland on Halcyon's behalf and by Luciano on behalf of GHS, GHS committed to:

a. Open GHS's network of partners to Halcyon as needed ("including but not limited to financial partners, CFO, investors, structural engineers…");

b. Conduct a meeting with GHS's Manufacturing Partner Cretes ("Cretes") and Halcyon to discuss equipment and design of facility specific to Halcyon (Halcyon was allowed to visit Cretes in Europe if travel permitted);

c. Provide Halcyon with a formal quote for the total cost of equipment for their chosen hemp fiber processing facility package;

d. Provide guidance to Halcyon in sourcing local services not provided by the manufacturer to complete procurement and installation;

e. Cross promotions with Halcyon to help Halcyon gain traction; and

f. Provide Halcyon with a facility layout rendering based on their specific design (after payment of an additional engineering fee).

35. Cretes did provide a formal quote for the cost of hemp fiber processing equipment to Halcyon on or about February 16, 2022.

36. With the exception of the formal quote from Cretes, Halcyon did not receive any other services or assistance from GHS in exchange for the $50,000.00 payment from Plaintiff. Surely, the value of a mere quote did not equate to $50,000.00.

The Invalid Professional Services Agreement between Halcyon and Quantum

37. Halcyon had retained GHS as a required step to forming an agreement with Quantum. Based on representations by GHS, Halcyon believed that Quantum's services were required to assist and guide the new business through the capital funding process.

38. Quantum's President and CFO, Stafford Worley ("Worley"), and his partner or colleague William Hartung ("Hartung"), spoke with Holland and Lee and provided them with a Professional Services Agreement dated February 14, 2022, attached hereto, collectively with the various addendums entered into between the Halcyon and Quantum (collectively, "PSA"), and incorporated herein by reference as **Exhibit B**.

39. The PSA purported to describe three phases of service that Quantum would provide to Halcyon, each involving a set pre-paid fee, and each being aimed towards a promised capital raise on Halcyon's behalf of Thirty Million Dollars ($30,000,000.00).

40. Unbeknownst to Halcyon at the time the PSA was entered into, Addendum C, Part Two renders the entire agreement invalid.

41. In pertinent part, Addendum C states, "Quantum will be compensated by Halcyon for the Consulting Service with a lump sum fee payment equal to a calculation of 7% of the Capital Raise amount as outlined above, due in full upon Completion of, and a closing on, the Capital Raise ("Consulting Fee").

42. The Consulting Fee, in this context, equates to a commission on corporate securities being sold on Halcyon's behalf. Pursuant to the PSA, Quantum was to take a 7% commission on corporate securities it sold on Halcyon's behalf.

43. Pursuant to the express terms of the PSA, Ohio law governs the interpretation of the PSA.

44. Pursuant to Ohio Revised Code Section 1707.06(A)(1), no corporate securities may be sold where the commission exceeds 3%. *See Ohio Revised Code §1707.06(A)(1).*

45. Under the PSA, the commission to be paid to Quantum vastly exceeds 3%.

46. This unenforceable clause renders the entire PSA unenforceable and invalid because Addendum C, specifically Part Two, is material to the PSA, is central to the PSA, and goes to the heart of the PSA as it was the consideration that was contemplated to be paid to Quantum in exchanges for its services under the PSA.

47. The 7% commission Quantum was to receive from selling Halcyon's corporate securities is corroborated by Quantum's very own complaint, a public record, at Paragraph 30, filed months after this instant action was instituted, in the United States District Court for the Northern District of Ohio, Eastern Division, attached hereto and incorporated herein by reference as **Exhibit C**.

Quantum, Worley, and Hartung's Misrepresentations

48. Unbeknownst to Halcyon, while some Quantum personnel held licenses to be involved in securities transactions, Worley and Hartung, on information and belief, did not. At all relevant times, Worley and Hartung were the only Quantum personnel that Holland and Lee dealt with, other than support staff.

49. In addition to being unregistered with Financial Industry Regulatory Authority (FINRA), Worley and Hartung lacked registration with their local Ohio securities regulators.

50. Hartung and Worley assured Holland and Lee that they were professionals with a range of funding sources in their network and that they had experience specifically in fundraising for startup hemp processing companies.

51. Hartung and Worley repeatedly stated that they believed they would be able to achieve Halcyon's capital raise goals by following their "system."

52. Quantum, through Hartung and Worley, claimed that they would be screening investors along the way, and that they were part of a syndicate that had a large pool of investors which would assist in the capital raise process on a reasonable timeline.

53. Hemp production in the United States had peaked in 2019, fueled in part by the spike in popularity of growing for CBD and the mistaken connection between the two related plants. By 2021, hemp farming was already vastly reduced, and the market was continuing to contract. *See* Will Hemp Production Decrease Again in 2021? - Hemp Benchmarks; The Hemp Boom is Over. What Now? - Stateline.

54. The rapid reduction of farmers willing to grow hemp was well-covered by the media and would have been either known or easily discovered by any legitimate fundraising entity prior to the acceptance of the PSA by Halcyon.

55. Quantum, Worley, and Hartung ignored or unjustifiably failed to investigate the actual likelihood of successfully raising capital for a hemp processing startup, and encouraged Halcyon to engage their services pursuant to the PSA.

56. Hartung and Worley assured Holland and Lee that Halcyon would remain in control throughout the capital raise process.

57. On February 24, 2022, in reliance on the representations of Hartung and Worley, Holland executed the PSA on Halcyon's behalf and delivered it via e-mail to Worley and Hartung.

58. On February 28, 2022, Halcyon wired Thirty-Five Thousand Dollars ($35,000.00) to Quantum pursuant to Addendum A of the PSA, which required up-front payment for the preparation by Quantum of a Preliminary Prospectus.

59. In April of 2022, Quantum's focus in meetings with Halcyon was on soliciting investors in private investment bonds and/or public bonds, while avoiding equity firms.

60. During this same time period, Quantum began discussing the use of a test crop to work out any issues with the equipment or logistics; the test crop would be funded through the capital raise, according to Quantum.

61. By the beginning of May 2022, Quantum had raised the recommended capital raise amount from Thirty Million Dollars ($30,000,000.00 USD) to closer to Forty-Two Million Dollars ($42,000,000.00). Quantum representatives stated that they would have the Preliminary Prospectus done by later in the month and that they would then begin reaching out to financial sectors.

62. Quantum continued to represent that they were intending to seek the entirety of the financing through a mix of bonds.

63. Contrary to the initial promise that Halcyon would remain in control throughout the process, Quantum dictated both the pace of the interactions and the content of meetings, making it clear that Holland and Lee were expected to follow instructions.

Similarly Situated Hemp Company in Texas

64. As part of Plaintiff's due diligence process, Plaintiff sought to discuss Quantum and Quantum's "system" with other help processors who had used Quantum's services.

65. After discussing these issues with Whitehouse, Whitehouse provided Holland with the contract information for Bryan Wilson ("Wilson"), Co-founder and President of Texas-based company, Environmental Living Industries ("ELI"). Upon information and belief, Wilson became independently wealthy through Bitcoin investments.

66. On or about October 18, 2021, Holland contacted Wilson through their respective, LinkedIn accounts.

67. Wilson provided Holland with a variety of information, inclusive of an introduction to a hemp insulation manufacturer and potential offtake targets, but provided little information on Quantum other than confirming that ELI was also working with them. As ELI seemed legitimate, and combined mostly with the representations of Quantum through Worley and Hartung, Plaintiff moved forward with its relationship with Quantum in or around February 2022.

68. On September 22, 2022, given the lack of services provided by Quantum, and now discovering that many representations made by Worley and Hartung were false, Holland and Lee had a phone conversation with Wilson in which Wilson stated that (i) ELI was still not operational; (ii) ELI was two years out from speaking to Economic Development Corporations (EDCs); (iii) ELI had already spent $1,200,000.00 in the venture; and (iv) Quantum still had not completed any fundraising for ELI.

69. Holland followed up again with Wilson in August 2022 and September 2023, whereby Wilson again confirmed that ELI had (i) still not completed any fundraising with Quantum; and (ii) Quantum was still "finalizing" a golden package.

The Preliminary Prospectus

70. On May 31, 2022, Quantum provided Halcyon with a Preliminary Prospectus.

71. The Preliminary Prospectus consisted of an Executive Summary using language provided by Halcyon and also describing GHS and Quantum; a Company Overview repeating and in some instances rephrasing much of the Executive Summary; a Products Offered list supplied by Halcyon; a Marketing/Sales Strategy section promising that a marketing strategy would be developed in coordination with another consultant and containing primarily generic information about the global hemp market and possible uses for hemp; a Management Profile which again recycled and rephrased information from the Executive Summary; and the Desired Deal Structure and Use of Proceeds. Finally, the Preliminary Prospectus contained a Financial Information section based on what Quantum claimed to be significant due diligence and containing tables with a sufficiently rosy forecast to theoretically attract potential investors.

72. The Preliminary Prospectus also had two appendices; one dedicated full-page descriptions to each associated Quantum staff member, while condensing Halcyon's founders and future advisory board into a single abbreviated page, and the second consisted of the equipment proposal provided to Halcyon by Cretes through GHS.

73. Addendum A to the PSA, Exhibit B herein, specifically represented that the Preliminary Prospectus was "intended to be used by Halcyon in support of an effort to raise capital related to Halcyon's hemp processing business startup." The language of the Prospectus itself, however,

represented that it was the sole property of Quantum, severely limiting its usefulness to Halcyon despite the substantial fee paid by Halcyon for its preparation. Hartung and Worley later confirmed that Halcyon was not allowed to use or distribute the Preliminary Prospectus as it remained, in their view, the property of Quantum.

<u>The Private Placement Memorandum</u>

74. Following the preparation of the Preliminary Prospectus, Halcyon paid another non-refundable, due in advance fee to Quantum of Twenty-Five Thousand Dollars ($25,000.00 USD), this time for the preparation of a Private Placement Memorandum ("<u>PPM</u>"), in accordance with Addendum B to the PSA.

75. Similar to the Preliminary Prospectus, Addendum B stated that the PPM was "intended to be used in support of an effort by Halcyon to raise capital related to Halcyon's hemp processing business startup."

76. On or about June 27, 2022, Quantum produced a PPM.

77. The PPM purported to offer private bonds in Halcyon for a minimum of One Hundred Thousand Dollar ($100,000.00 USD) investment.

78. With the exception of a single page describing Holland and Lee's backgrounds, and references throughout to the offered bond principal amount, including the minimum and maximum offering amounts, the bare-bones PPM consisted of boilerplate warnings and subsections required for the sale of private investment bonds, and utilized the Preliminary Prospectus as an exhibit.

79. Concurrently with the issuance of the PPM, which was solely focused on a private bond offering, Quantum began to raise different proposed mixes of financing in meetings with Halcyon. Quantum now represented that they would seek approximately 75% of the capital raise from the

private bond offering, with the remainder to be funded by a combination of equity, mezzanine funding, and subordinate debt.

80. Quantum also stated for the first time in their July 1, 2022, meeting with Halcyon that Halcyon had a number of pre-requisites that would need to be "brought down to ground level" before Quantum's financial partners could be brought in for the capital raise process.

81. The PSA with Quantum required yet another substantial fee from Halcyon; an additional Forty Thousand Dollar ($40,000.00 USD) non-refundable retainer fee, due upon completion of the PPM, and intended to exclusively engage Quantum to consult on coordinating the capital raise for Halcyon.

82. Addendum C to the PSA, which governed this third non-refundable payment to Quantum, stated that Quantum and Halcyon agreed that the capital raise funds would be available for Halcyon's use within an estimated nine months from Halcyon's payment.

83. As noted *supra*, the PSA illegally provided for a further payment to Quantum of 7% of the capital raise, had any capital raise actually taken place, in addition to the Forty Thousand Dollar ($40,000.00 USD) fee.

84. Halcyon paid the additional Forty Thousand Dollars ($40,000.00 USD) to Quantum on or about July 8, 2022.

<u>Quantum's Failures</u>

85. By the middle of July 2022, five months after signing the PSA, Halcyon was pushing Quantum for less ambiguity, so that it could prepare for each stage as it came and ensure that Quantum had any needed prerequisites in place.

86. For the first time, Quantum mentioned interim borrowing solutions that could be borrowed against the larger capital raise. Quantum represented that another One Hundred Fifty Thousand Dollars ($150,000.00 USD) would be necessary to get Halcyon properly prepared; Halcyon made clear that self-funding this amount, after the amounts they had already poured into GHS and Quantum's fees, would not be possible. Quantum instructed Halcyon to prepare a pre-operational timeline showing how the funds would be spent once they were obtained from whatever source Halcyon could locate.

87. Quantum shifted the capital raise plan to a mix of 60% bond funding, 25% subordinate debt, and 15% equity during this same meeting.

88. By their August 12, 2022, meeting with Quantum, Halcyon had already vetted and lined up several farmers in Virginia willing to raise the initial pilot crop – no small feat in light of the overall glutted market for hemp and requiring substantial time investments by Holland and Lee. Quantum had no suggestions for how to fund the interim budget of One Hundred Fifty Thousand Dollars ($150,000.00 USD) that included this pilot crop.

89. Frustrated by the lack of guidance and support from Quantum, Holland and Lee began researching SBA loans and alternate avenues to raise the interim One Hundred Fifty Thousand Dollars ($150,000.00 USD) without success.

90. When they informed Quantum of these unsuccessful efforts, Quantum's response was to state that they wouldn't need funds until later, and to instruct Halcyon to create yet another budget factoring in any costs that they could think of for the initial 6-9 months of operations and then to add 50% on top of that.

91. Quantum did not explain how this new budget would affect the budgets and financial forecasts included in the bond-centric PPM which, to Halcyon's knowledge, had yet to be shown to anyone other than Halcyon.

92. Like the Preliminary Prospectus, the PPM was presented as being Quantum's property despite the language in the PSA describing its purpose.

93. By September 9, 2022, Quantum was suggesting that salary funding should also be factored into the budget and claimed that they were floating a "small" interim raise of One Million ($1,000,000.00 USD) with their financial network. Quantum continued to state that there was plenty of time and that they had ample investment possibilities available.

94. During the same September 9th meeting, Holland and Lee raised the idea of switching processing machinery companies from Cretes to another manufacturer to reduce equipment costs. At this point, Holland and Lee had heard nothing from GHS since paying their fee.

95. On October 21, 2022, Quantum and Halcyon met again. At this point, Quantum was recommending a capital raise mixture of 60% senior debt, 20% mezzanine, and 20% equity.

96. Quantum for the first time stated that an equity capital raise would be required because it was too early in the process for debt financing to be successful. They projected a three-month time frame before they would have a sense of the availability of equity financing, which would be approximately six months after the payment by Halcyon of the Forty Thousand Dollars ($40,000.00 USD) capital raise retainer.

97. Quantum then raised the interim raise target to nearly One Million Five Hundred Thousand ($1,500,000.00 USD), adding in interim costs for market studies, a sales consultant, and an independent engineer.

98. By November 4, 2022, Quantum had still raised no funds through either debt or equity channels, nor were any efforts to raise funds ever identified to Halcyon; the lack of interim funding meant that Halcyon could not proceed with the farmers or the initial test crop, nor could they finalize a lease on any of the sites they had researched in Virginia for their physical plant.

99. Quantum suggested funding through either an equity partner or USDA loans, representing that both would take two to three months to get into place but claiming that they were still comfortable with their original nine-month timeline and that there was no need to break Quantum's exclusivity; more specifically, Quantum, through Worley and Hartung, represented that Quantum was close to a firm that had done the most USDA loans in the country and that this was a viable source of funds—however, these farm loans require a 25% collateral source of more.

100. Halcyon, increasingly nervous about the large expenditure of time and funds with no capital raise in sight, suggested bringing in other capital raise partners to assist, specifically referencing InvestJustly as a potential source of help in finding funding.

101. Quantum and Halcyon again discussed partnering with InvestJustly at the beginning of December 2022, noting that Quantum eventually met with InvestJustly representatives.

102. Quantum and Halcyon met again on December 16, 2022. During that meeting, Quantum continued to claim that they were certain that they could raise sufficient capital, but for the first time, expressed concern that they could get funding in time for a 2023 crop trial to take place.

103. Quantum announced that at this point their goal was to locate an equity investor who could supply the entire equity portion of the raise, then advance pre-operational interim funds from that amount; a goal that they believed would "somewhat possibly" raise Three Million Dollars ($3,000,000.00 USD) by the end of March, 2023, nine months after Halcyon's payment of the

retainer and significantly less than the full capital raise amount that was originally scheduled to be completed during that period.

104. Quantum also revealed for the first time that they were working on another capital raise for a different client that "might" be leading to some overlap in terms of potential investors.

105. Quantum discussed preparing a two page "teaser" to float to potential investors.

106. Halcyon, rather than Quantum, prepared a "pitch deck" to describe the company to potential investors in an effort solicit the interest of serious, angel investors who could fund the pre-capital raise. Quantum instructed Holland and Lee not to distribute the pitch deck and not to use the Preliminary Prospectus.

## Halcyon's Mitigation of Damages

107. By the end of December, Holland and Lee realized that Quantum's constantly changing numbers and deadlines were no longer tied to or consistent with the known costs of Halcyon's plans and began looking for ways to assist with raising funds, continuing to rely on Quantum's initial promise that Halcyon would retain overall control.

108. Quantum had consistently pushed back the timeframe for the capital raise, despite having been retained for the sole purpose of raising capital.

109. Quantum was now claiming that they would need to redo the Preliminary Prospectus, while Halcyon was pushing for more control over the process to keep the budgets on track with what was actually needed for their business to move forward.

110. By December of 2022, Quantum had not brought any potential investors or any defined potential sources of funding to Halcyon despite having been paid $100,000.00.

111. By early January of 2023, Halcyon was still trying to get information on the path forward with Quantum while Quantum began insisting that Halcyon sign an additional nondisclosure agreement to protect Quantum's "trade secrets and proprietary information."

112. Halcyon initially requested a significantly reduced interim raise figure, as well as the updated prospectus and an updated sources and uses statement.

113. Negotiations between the parties broke down in mid-January, 2023.

114. Quantum formally terminated the PSA as of July 1, 2023, after refusing to negotiate a revised set of terms.

<u>Damages Suffered by Halcyon</u>

115. Quantum never raised any funds on Halcyon's behalf.

116. Quantum provided Halcyon with two documents, both consisting largely of boilerplate language with the specifics provided by Halcyon but did not allow Halcyon to retain the use or ownership of either the Preliminary Prospectus or the PPM.

117. Halcyon paid in full and in advance for both the Preliminary Prospectus and the PPM.

118. Halcyon paid a Forty Thousand Dollar ($40,000.00 USD) retainer for the capital raise that never took place as a direct result of Quantum's dilatory conduct.

119. As a proximate result of Quantum's dilatory conduct and breach of good faith and fair dealing, Halcyon suffered significant monetary loss and damages, including the loss of One Hundred Thousand Dollars ($100,000.00 USD) paid to Quantum and the loss of the possibility of entry into the hemp processing marketplace.

120. Halcyon paid Fifty Thousand Dollars ($50,000.00 USD) to GHS in return for an array of promised services.

121. With the exception of a quote for hemp processing equipment provided by GHS's affiliate Cretes, GHS failed to provide any of the promised services to Halcyon.

122. As a proximate result of GHS's dilatory conduct and breach of good faith and fair dealing, Halcyon suffered significant monetary loss and damages, including but not limited to the loss of Fifty Thousand Dollars ($50,000.00 USD).

123. In addition to the substantial sums paid by Halcyon directly to Quantum and GHS, the wrongful acts of Defendants drained Halcyon of funds and caused the complete failure of Halcyon.

124. As a proximate cause of the wrongful conduct of Defendants, Halcyon suffered additional losses. Holland and Lee paid Fourteen Thousand Five Hundred Sixty-Seven Dollars ($14,567.00 USD) in legal fees following Quantum's instructions in an effort to start Halcyon correctly.

125. Lee relocated at an additional cost of Five Thousand Dollars ($5,000.00 USD) so that he would be physically available for Halcyon's start, with Quantum's knowledge and encouragement.

126. Halcyon through Lee and Holland had additional costs in the form of additional loans and business tuition incurred in the course of visiting and vetting locations, meeting and researching additional vendors, investors, and forms of assistance, and preparing themselves for the start of a business that was irreparably harmed by the actions and inactions of Quantum and GHS. These additional damages to Halcyon amounted to no less than One Hundred Forty Thousand Dollars ($140,000.00 USD).

127. As a direct and proximate result of the conduct complained of herein, Halcyon was harmed in an amount to be proven at trial, but in no event less than Three Hundred Nine Thousand Five Hundred Sixty-Seven Dollars ($309,567.00).

128. Defendants acted under circumstances amounting to a reckless, willful, and wanton disregard of Plaintiff's rights, which also justifies the award of punitive damages in the amount of $350,000.00 pursuant to Va. Code § 8.01-38.1 as to the applicable torts claim(s) herein.

## STATEMENT OF CLAIMS

### COUNT I
### Securities Fraud in Violation of § 10[b]
### *(as against Quantum)*

129. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Amended Complaint with the same force and vigor as if set out here in full.

130. Throughout its relationship with Halcyon, Quantum misrepresented material information in connection with the capital raise.

131. Plaintiff Halcyon detrimentally relied upon Quantum's false representations.

132. Plaintiff Halcyon was harmed by its reliance upon Quantum's false representations.

133. Plaintiff suffered direct and indirect financial harm as a result of its reliance and was destroyed as a result.

134. As a result of Quantum's actions, Plaintiff has suffered injuries and damages including, but not limited to, the loss of One Hundred Thousand Dollars ($100,000.00 USD) paid to Quantum.

### COUNT II
### Breach of Fiduciary Duty
### *(as against GHS and Quantum)*

135. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Amended Complaint with the same force and vigor as if set out here in full.

136. Halcyon put its faith and confidence in GHS and Quantum, both of whom were in a position of superior knowledge and offered guidance in exchange for fees.

137. Halcyon placed its property and its existence in the charge of GHS and Quantum.

138. GHS and Quantum owed a fiduciary duty to Halcyon.

139. GHS breached its duty to Halcyon.

140. Quantum breached its duty to Halcyon.

141. As a result of the Defendants' breach of the fiduciary duty owed to Plaintiff, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Three Hundred and Nine Thousand, Five Hundred Sixty-Seven Dollars ($309,567.00 USD).

142. Defendants acted under circumstances amounting to a reckless, willful, and wanton disregard of Plaintiff's rights, which also justifies the award of punitive damages in the amount of $350,000.00 pursuant to Va. Code § 8.01-38.1 as to the applicable torts claim(s) herein.

**COUNT III**
**Breach of Duty of Good Faith and Fair Dealing**
***(as against GHS and Quantum)***

143. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Amended Complaint with the same force and vigor as if set out here in full.

144. GHS agreed to provide "guidance" to Halcyon and to open its network of financial partners to them, both describing discretionary forms of performance.

145. GHS acted arbitrarily or unfairly in breach of its duty of good faith and fair dealing by never contacting or working with or for Halcyon again after receiving its fee and providing an equipment quote.

146. Quantum agreed to serve as a consultant to Halcyon throughout the capital raise process, which allowed for discretionary performance.

147. Quantum acted arbitrarily or unfairly in breach of its duty of good faith and fair dealing by the actions and inactions described herein.

148. As a result of the Defendants' breach of the fiduciary duty owed to Plaintiff, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Three Hundred and Nine Thousand, Five Hundred Sixty-Seven Dollars ($309,567.00 USD).

149. Defendants acted under circumstances amounting to a reckless, willful, and wanton disregard of Plaintiff's rights, which also justifies the award of punitive damages in the amount of $350,000.00 pursuant to Va. Code § 8.01-38.1 as to the applicable torts claim(s) herein.

**COUNT IV**
**Breach of Contract**
**(*as against GHS*)**

150. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Amended Complaint with the same force and vigor as if set out here in full.

151. Plaintiff and GHS entered into a contract, the Retainer Agreement.

152. Pursuant to the Retainer Agreement, Plaintiff was obligated to pay a retainer fee of Fifty Thousand Dollars ($50,000.00) to GHS at the time of signing, which Plaintiff did.

153. At all times relevant hereto, Plaintiff performed every obligation of it under the Retainer Agreement.

154. In Exchange, GHS was obligated to provide **all** (emphasis added) of the following services, including, *inter alia*:

a. Open GHS's network of partners to Halcyon as needed ("including but not limited to financial partners, CFO, investors, structural engineers…");

b. Conduct a meeting with GHS's Manufacturing Partner Cretes and Halcyon to discuss equipment and design of facility specific to Halcyon (Halcyon was allowed to visit Cretes in Europe if travel permitted);

c. Provide Halcyon with a formal quote for the total cost of equipment for their chosen hemp fiber processing facility package;

d. Provide guidance to Halcyon in sourcing local services not provided by the manufacturer to complete procurement and installation;

e. Cross promotions with Halcyon to help Halcyon gain traction;

f. Provide Halcyon with a facility layout rendering based on their specific design (after payment of an additional engineering fee).

155. Aside from GHS's affiliate, Cretes, providing a singular quote for the cost of equipment for a hemp fiber processing facility package, GHS failed to comply its other contractual obligations.

156. GHS breached the Retainer Agreement by failing to provide the majority of the services, if not all of the services, it was legally and contractually obligated to provide to Plaintiff.

157. In consequence, Plaintiff suffered damages in the form of financial compensation Plaintiff provided to GHS for essentially no services from GHS whatsoever.

158. As a result, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Fifty Thousand Dollars ($50,000.00 USD) from GHS.

**COUNT V**
**Quantum Meruit – in the alternative as to GHS**
***(as against GHS and Quantum)***

159. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Amended Complaint with the same force and vigor as if set out here in full.

160. Plaintiff entered into a retainer agreement with GHS whereby Plaintiff sought certain services from GHS and GHS committed to providing certain services, including, *inter alia*:

a. Open GHS's network of partners to Halcyon as needed ("including but not limited to financial partners, CFO, investors, structural engineers…");

b. Conduct a meeting with GHS's Manufacturing Partner Cretes and Halcyon to discuss equipment and design of facility specific to Halcyon (Halcyon was allowed to visit Cretes in Europe if travel permitted);

c. Provide Halcyon with a formal quote for the total cost of equipment for their chosen hemp fiber processing facility package;

d. Provide guidance to Halcyon in sourcing local services not provided by the manufacturer to complete procurement and installation;

e. Cross promotions with Halcyon to help Halcyon gain traction;

f. Provide Halcyon with a facility layout rendering based on their specific design (after payment of an additional engineering fee).

161. In exchange, GHS sought financial compensation in the amount of Fifty Thousand Dollars ($50,000.00), which Plaintiff provided to GHS.

162. Aside from GHS's affiliate, Cretes, providing a singular quote for the total cost of equipment for a hemp fiber processing facility package, GHS failed to perform any of the other services promised to Plaintiff.

163. The quote amounted to little to no value to Plaintiff because, due to the failure to honor their other commitments and due to Quantum's utter failure to honor its commitments, Plaintiff was prevented from commencing business operations whatsoever.

164. Therefore, the reasonable value of the services provided by GHS is negligible to none and Plaintiff is entitled to the full value of the financial compensation paid to GHS.

165. Due to the unenforceable Addendum C clause 2 calling for compensation by Plaintiff to Quantum for consulting services with a lump sum fee payment equal to a calculation of 7% of the capital raise amount outlined in the PSA, the PSA is void and of no effect. Consequently, alleging breach of contract against Quantum would be frivolous.

166. However, irrespective of the enforceability of the PSA, Plaintiff asked Quantum to perform services including, *inter alia*, raising capital funds.

167. In exchange, Quantum sought financial compensation and Plaintiff provided Quantum financial compensation in the amount of One Hundred Thousand Dollars ($100,000.00 USD).

168. Quantum failed to perform its essential service of raising any capital funds for Plaintiff.

169. Consequently, the value of Quantum's services is nothing and Plaintiff is entitled to the full value of the financial compensation paid to Quantum.

170. As a result, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Fifty Thousand Dollars($50,000.00 USD) from GHS and no less than One Hundred Thousand Dollars ($100,000.00 USD) from Quantum.

**COUNT VI**
**Unjust Enrichment – in the alternative as GHS and Quantum**
***(as against all Defendants)***

171. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Amended Complaint with the same force and vigor as if set out here in full.

172. Plaintiff conferred a benefit on Defendant GHS, more specifically, Plaintiff paid GHS a non-refundable Fifty Thousand Dollar ($50,000.00) "retainer" to GHS in order to obtain their services on February 7, 2022.

173. GHS knew of the benefit conferred by Plaintiff, because the payment was made directly to GHS, and should reasonably have expected to repay Plaintiff because Plaintiff made the payment in exchange for a number of services of GHS.

174. In return for the benefit Plaintiff conferred and as payment for the value of that benefit, GHS agreed to provide an array of services, including, *inter alia*:

a. Open GHS's network of partners to Halcyon as needed ("including but not limited to financial partners, CFO, investors, structural engineers…");

b. Conduct a meeting with GHS's Manufacturing Partner Cretes and Halcyon to discuss equipment and design of facility specific to Halcyon (Halcyon was allowed to visit Cretes in Europe if travel permitted);

c. Provide Halcyon with a formal quote for the total cost of equipment for their chosen hemp fiber processing facility package;

d. Provide guidance to Halcyon in sourcing local services not provided by the manufacturer to complete procurement and installation;

e. Cross promotions with Halcyon to help Halcyon gain traction; and

f. Provide Halcyon with a facility layout rendering based on their specific design (after payment of an additional engineering fee).

175. GHS retained the benefit conferred by Plaintiff without paying for its value by failing to honor any of the six commitments identified *supra* except its affiliate Cretes, providing a quote for hemp processing equipment.

176. Plaintiff also conferred a benefit on Quantum, Worley, and Hartung, more specifically, Plaintiff wired Quantum Thirty-Five Thousand Dollars ($35,000.00 USD) as up-front payment for the preparation by Quantum of a Preliminary Prospectus. As members of Quantum, Worley and Hartung directly benefited from this transfer of funds to Quantum.

177. Quantum, Worley and Hartung knew of the benefit conferred by Plaintiff, because the payment was made directly to Quantum, and should reasonably have expected to repay Plaintiff because the payment was made in exchange for the preparation of a Preliminary Prospectus.

178. Quantum, Worley and Hartung retained the benefit conferred by Plaintiff without paying for its value because, although a Preliminary Prospectus was provided, Quantum did not allow Plaintiff to retain the use or ownership of it and subsequently claimed they needed to redo the Preliminary Prospectus and a redone Preliminary Prospectus was never provided to Plaintiff prior to Quantum's termination of the agreements between the parties.

179. Following the preparation of the Preliminary Prospectus that needed to be redone by Quantum, Plaintiff conferred another benefit on Quantum by paying a non-refundable fee to Quantum of Twenty-Five Thousand Dollars ($25,000.00) for preparation of a PPM. As members of Quantum, Worley and Hartung directly benefited from this transfer of funds to Quantum.

180. Quantum, Worley and Hartung were aware of the benefit conferred by Plaintiff, because this payment was also made directly to Quantum, and should reasonably have expected to repay Plaintiff by preparing a PPM "to be used in support of an effort by Halcyon to raise capital related to Halcyon's hemp processing business startup."

181. Although a PPM was prepared by Quantum, Plaintiff was not allowed to retain the use or ownership of it and it did not satisfy it's intended purpose because, with the exception of a single page describing Holland and Lee's backgrounds, and references throughout to the offered bond principal amount, including the minimum and maximum offering amounts, the bare-bones PPM consisted of boilerplate warnings and subsections required for the sale of private investment bonds.

182. Consequently, Quantum, Worley, and Hartung, retained the benefit conferred by Plaintiff without paying for its value because the PPM was useless and failed to satisfy its intended purpose.

183. Thereafter, Plaintiff conferred yet another benefit on Quantum in the form of another non-refundable payment of Forty Thousand Dollars ($40,000.00 USD), on July 8, 2022, which was

due upon completion of the PPM and intended to exclusively engage Quantum to consult on coordinating and securing the capital raise for Plaintiff. As members of Quantum, Worley and Hartung directly benefited from this transfer of funds to Quantum

184. Quantum, Worley, and Hartung were aware of the benefit conferred by Plaintiff, because this payment was also made directly to Quantum, and Quantum should reasonably have expected to repay Plaintiff by coordinating and securing the capital raise for Plaintiff.

185. Quantum, Worley, and Hartung retained the benefit of this payment without paying Plaintiff for its value by failing to raise any capital funds, by not bringing Plaintiff any potential investors or defining any potential sources of funding, for Plaintiff prior to terminating the agreements between the parties on July 1, 2023, and refusing to negotiate a revised set of terms.

186. As a result of GHS's unjust enrichment, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Fifty Thousand Dollars ($50,000.00 USD).

187. As a result of Quantum, Worley, and Hartung's unjust enrichment, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than One Hundred Thousand Dollars ($100,000.00).

## COUNT VII
## Fraudulent Inducement
## (*as against all Defendants*)

188. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Amended Complaint with the same force and vigor as if set out here in full.

189. GHS made material misrepresentations that were positive statements of fact for the purpose of procuring a contract with Plaintiff including, *inter alia*:

a. GHS Founder and CEO Luciano confirmed to Holland that a Fifty Thousand Dollar ($50,000.00 USD) deposit from Halcyon to GHS would secure equipment for Halcyon's eventual purchase and use and was necessary for Halcyon to be eligible to work with a capital fundraising service and be able to enter the hemp marketplace effectively.

b. Plaintiff was led to believe that retention of GHS was a condition precedent to forming an agreement with Quantum, whose services Plaintiff was led to believed were required to assist and guide Plaintiff, a nascent business entity, through the capital funding process.

190. These misrepresentations were untrue because, aside from one quote for hemp processing equipment provided by Cretes, an affiliate of GHS but an altogether separate and distinct entity, GHS failed to secure equipment for Plaintiff's eventual purchase and use. Likewise, it proved untrue that GHS's retention was required to retain Quantum and that Quantum's services were required to assist and guide Plaintiff through the capital funding process.

191. Plaintiff relied on GHS's misrepresentations and was induced by GHS's misrepresentations to enter into agreements with GHS, which entailed payment to GHS of $50,000.00 for the promised services and for the promise that, thereafter, Quantum would assist and guide Plaintiff through the capital funding process.

192. Quantum, Worley, and Hartung, made material misrepresentations that were positive statements of fact for the purpose of procuring contracts with Plaintiff including, *inter alia*:

a. Hartung and Worley, agents of Quantum, assured Holland and Lee that they were professionals with a range of funding sources in their network and that they had experience specifically in fundraising for startup hemp processing companies, such as Plaintiff.

b. Hartung and Worley repeatedly stated that they believed they would be able to achieve Halcyon's capital raise goals by following their "system."

c. Quantum reiterated this misrepresentation, in a December 16, 2022, meeting, where they continued to claim that they were certain that they could raise sufficient capital.

d. Quantum, through Hartung and Worley, claimed that they would be screening investors along the way, and that they were part of a syndicate that had a large pool of investors which would assist in the capital raise process on a reasonable timeline.

e. Quantum initially promised that Plaintiff would remain in control throughout the process.

f. Addendum C to the PSA, which governed the Forty Thousand Dollar ($40,000.00), non-refundable payment to Quantum, stated that Quantum and Halcyon agreed that the capital raise funds would be available for Halcyon's use within an estimated nine months from Halcyon's payment.

g. Thereafter, Quantum suggested funding through either an equity partner or USDA loans, representing that both would take two to three months to get into place but claiming that they were still comfortable with their original nine-month timeline and that there was no need to break Quantum's exclusivity.

h. Quantum represented that another $150,000.00 would be necessary to get Plaintiff's business properly prepared.

193. Quantum, Worley, and Hartung, further engaged in concealment, or the deliberate nondisclosure, of information in connection with their relationship with Plaintiff, including, *inter alia*:

a. On information and belief, unbeknownst to Plaintiff until after entering into agreements with Quantum, while some Quantum personnel held licenses to be involved in securities transactions, Worley and Hartung, who were the only Quantum personnel that Holland and Lee dealt with, at all times relevant, did not.

b. Quantum stated for the first time in their July 1, 2022, meeting with Plaintiff that Plaintiff had a number of pre-requisites that would need to be "brought down to ground level" before Quantum's financial partners could be brought in for the capital raise process.

c. On October 21, 2022, Quantum, for the first time, stated that an equity capital raise would be required because it was too early in the process for debt financing to be successful. They projected a three-month time frame before they would have a sense of the availability of equity financing, which would be approximately six months after the payment by Halcyon of the Forty Thousand Dollar ($40,000.00 USD) capital raise retainer.

194. These misrepresentations were untrue for numerous reasons, including, *inter alia*:

a. Despite assurances and certainties and a quantitative timeline of nine months for capital funds to be raised, represented by Quantum, Quantum continually pushed

back the timeframe and, ultimately, no capital funds were ever raised for Plaintiff. Instead, Quantum kept insisting that more money from Plaintiff's was necessary until it was clear Quantum had bled Plaintiff dry.

b. Despite Quantum's promise that Plaintiff would remain in control throughout the process, Quantum dictated both the pace of the interactions and content of the meetings, making clear that Holland and Lee, and ultimately, Plaintiff, were expected to follow instructions. What is more, after Quantum terminated the agreements between the parties, Plaintiff was not allowed to retain use or ownership of the PPM or Preliminary Prospectus—documents that, admittedly, consisted largely of boilerplate language with specifics that had been provided by Plaintiff—that had been designed specifically for Plaintiff's use.

195. The fraudulent nature of Quantum, Worley, and Hartung's representations was made more salient by the fact that Hemp production in the United States had peaked in 2019, fueled in part by the spike in popularity of growing for CBD and the mistaken connection between the two related plants. By 2021, hemp farming was already vastly reduced, and the market was continuing to contract, noting that the industry still isn't mature. *See* Will Hemp Production Decrease Again in 2021? - Hemp Benchmarks; The Hemp Boom is Over. What Now? - Stateline.

196. This rapid reduction of farmers willing to grow hemp was well-covered by the media and would have been either known or easily discovered by any legitimate fundraising entity prior to the acceptance of the PSA by Plaintiff. But Quantum ignored or unjustifiably failed to investigate the actual likelihood of successfully raising capital for a hemp processing startup.

197. Plaintiff relied on Quantum, Worley, and Hartung's many misrepresentations that capital would be raised within a defined timeline. Plaintiff further relied on the absence of the information Quantum, Worley, and Hartung concealed from Plaintiff and would not have agreed to work with Quantum or work with Quantum on the same terms if that information had been known prior to signing the PSA.

198. Plaintiff was induced by Quantum, Worley, and Hartung's misrepresentations to enter into the PSA.

199. Quantum, Worley, and Hartung, moreover, knew the information they concealed was unknown to Plaintiff and deliberately concealed it from Plaintiff in an effort to induce Plaintiff to enter into the PSA.

200. Plaintiff relied on Quantum, Worley, and Hartung's misrepresentations and the absence of knowledge of information concealed by Quantum, Worley, and Hartung, and was induced by Quantum, Worley, and Hartung's misrepresentations and concealed information to enter into the PSA with Quantum, which entailed payment to Quantum, at minimum, of One Hundred Thousand Dollars ($100,000.00 USD) for the promised capital funds to be raised and the promise of control throughout the process.

201. In addition to the One Hundred Thousand Dollars ($100,000.00 USD) paid to Quantum under the PSA, Plaintiff, through its agents, Holland and Lee, paid Fourteen Thousand Five Hundred Sixty-Seven Dollars ($14,567.00 USD) in legal fees following Quantum, Worley, and Hartung's instructions in an effort to start Halcyon correctly.

202. What is more, Plaintiff, through its agent, Lee, relocated at an additional cost of Five Thousand Dollars ($5,000.00 USD) so that Lee would be physically available for Halcyon's start, with Quantum, Worley, and Hartung's knowledge and encouragement.

203. Plaintiff, through Lee and Holland, incurred additional costs in the form of additional loans and business tuition incurred in the course of visiting and vetting locations, meeting and researching additional vendors, investors, and forms of assistance, and preparing themselves for the start of a business that was irreparably harmed by the actions and inactions of Quantum and GHS. These additional damages to Plaintiff amounted to no less than One Hundred Forty Thousand Dollars ($140,000.00 USD).

204. The lack of interim funding, which was the central service promised by Quantum, meant that Plaintiff could not proceed with the farmers or the initial test crop, nor could they finalize a lease on any of the sites they had researched in Virginia for their physical plant.

205. As a result of Quantum, Worley, and Hartung's fraudulent inducement, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Two Hundred Fifty-Four Thousand Five Hundred Sixty-Seven Dollars ($254,567.00 USD).

206. As a result of GHS's fraudulent inducement, Plaintiff has suffered economic harm. Plaintiff has suffered injuries and damages in an amount to be determined at trial but estimated to be no less than Fifty Thousand Dollars ($50,000.00 USD).

207. Defendants acted under circumstances amounting to a reckless, willful, and wanton disregard of Plaintiff's rights, which also justifies the award of punitive damages in the amount of $350,000.00 pursuant to Va. Code § 8.01-38.1.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby requests a jury trial for all issues triable by jury including, but not limited to, those issues and claims set forth in any amended complaint or consolidated action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant him judgment containing the following relief:

a. Judgment in Plaintiff's favor against Defendants, jointly and severally, as applicable;

b. Compensatory damages, including economic damages in an amount to be proven at trial, but in no event less than $309,567.00;

c. Punitive damages in the amount of $350,000.00 pursuant to Va. Code § 8.01-38.1, as applicable;

d. Attorneys' fees (or consideration of such fees in determining punitive damages), and costs of this action;

e. Pre- and post-judgment interest; and

f. Such other or further relief as this Court deems just and proper.

Date: July 9, 2024

Respectfully submitted,

By: /s/_____Robert Powers__________

Robert Powers, Esq. (VSB No. 80822)
Tyler M. Roth, Esq. (VSB No. 93037)
McClanahan Powers, PLLC
3160 Fairview Park Drive, Suite 410
Falls Church, VA 22042
Telephone: (703) 520-1326
Facsimile: (703) 828-0205
Email: rpowers@mcplegal.com

troth@mcplegal.com
mmurawiec@mcplegal.com

Eric D. Postow, Esq.
Holon Law Partners, LLP
9480 Main Street #1238
Fairfax, VA 22031
Telephone: (703)214-2003
Email: epostow@holonlaw.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2024, I electronically filed the foregoing document, with redlined version, and corresponding exhibits with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing document via CM/ECF.

By: /s/ Robert Powers____
Robert Powers